of this suit it is difficult to imagine any circumstances which will give the Court of Common Pleas jurisdiction if the preliminary steps necessary to invest the Probate Court with jurisdiction have taken place. 3 Ohio Jurisprudence, 403 *et seq.; Peoples Bldg. & Sav. Co.* v. *Whorley,* 15 Ohio Law Abs., 690; *Madigan* v. *Dollar Bldg. & Loan Co.,* 49 Ohio App., 69, 195 N. E., 250; *Southard* v. *Prudential Ins. Co.,* 15 Ohio Law Abs., 457.

Certainly nothing that has been suggested by the plaintiff, exclusive of the allegation noted, would be sufficient to give the Common Pleas Court jurisdiction in the premises.

The judgment of the Common Pleas Court must be reversed and the case remanded for further proceedings in accordance with law.

*Judgment reversed and cause remanded.*

MATTHEWS and HAMILTON, JJ., concur.

THE PENNSYLVANIA RD. CO. *v.* MILLESON, A MINOR.

(Decided June 10, 1935.)

*Messrs. King, Flynn & Frohman,* for plaintiff in error.

*Mr. John F. McCrystal,* for defendant in error.

CARPENTER, J. In the trial court the defendant in error, Richard Milleson, obtained a verdict and judgment for $4,000 against the plaintiff in error, The Pennsylvania Railroad Company, for personal injuries claimed by him to have been sustained June 29, 1932, through the negligence of that company. The plaintiff in error alleges error in the trial court in its refusal to direct a verdict for it on the opening statement of counsel for plaintiff, at the close of plaintiff's evidence, and at the close of all the evidence.

The essential facts are substantially as follows:

Richard Milleson was born May 3, 1931. From that time to June 29, 1932, he lived with his parents, his six brothers, of whom the oldest was then seventeen, and a sister, seven, on a parcel of land several miles south of the city of Sandusky, the family occupying the property as tenants.

The right of way of the defendant railroad company passed through this land, the dwelling house being on the west side of the railroad. On the east side were a few acres of ground on which some of the older boys of the family had a pickle patch, which they planted and cultivated in the summer of 1932. A farm-crossing over the right of way had been provided by the railroad many years before, for the use of the occupants of the land in going to and from the east side.

On both sides of the right of way there were wire

fences, and in them at the crossing were farm gates about ten feet long and four feet high. The back porch of the residence was about 67 feet from the west gate. The railroad right of way is 66 feet wide, and in the center of it is a single standard gauge railroad track, which, at the farm crossing, is about three and one-half feet lower than the natural land surface on the west side where the house stood. The farm crossing is 337 feet north of a public highway crossing called Bardshar Road, which intersects the railroad right of way. The Milleson house faced that road. South of the road 1327 feet down the track is a whistling post, 1664 feet from the farm crossing. On June 29, 1932, weeds, some of which were three or four feet high, had grown up on the slopes of the right of way to within a few feet of the stone ballast which spread out from the ends of the ties in the road bed.

About three o'clock on the afternoon of June 29, 1932, plaintiff's father was at work at the cement plant some miles from his home, his mother was sewing carpet in the house, and the other children were about the premises. Donald, ten, had been working in the pickle patch and had left the west gate open wide enough for him to get through. The plaintiff, who then lacked five days of being fourteen months old, and could not walk, had, unknown to his mother, crept out of the back door of the house and onto the right of way. After a northbound train of 77 loaded coal cars passed, the mother missed plaintiff, and she and the children searched for him. His oldest brother found him lying near the west rail of the track over 100 feet north of the farm crossing. The front part of his left foot was severed and lay inside the west rail. The child's head was out of shape, and there were many bruises and cuts on his body. His clothing and body were covered with grease and dirt.

He was promptly taken to a hospital where an ampu-

tation was performed so as to leave the heel of his foot for a stump. His skull, which was found to have been fractured, was pressed into shape, and he was kept at the hospital for two months. The head has or will, fully recover, the attending physician says.

For these injuries this action was brought, and ten specifications of negligence are charged against the railroad company. They relate to five matters—weeds on the right of way, speed of the train, warning signals at the farm crossing, lookout kept by the train crew, and its control of the train.

The train crew testified it was traveling 20 to 25 miles per hour. Plaintiff's oldest brother, Henry, who saw the train pass, placed its speed at 20 to 30 miles per hour. He and his mother both testified they heard the whistle blow. None of the train crew saw the plaintiff, nor did any of them know they had struck him until the next morning, when they learned about it in Sandusky.

The degree of care required of the railroad company toward the plaintiff depended largely upon his legal status when he crept out upon the right of way. The company contends he was but a trespasser or licensee, and as such it owed to him only the duty not to wilfully or wantonly injure him after its agents knew of his presence on its property. Counsel for plaintiff claims he had a right to be there.

It is true the crossing was established and maintained for the use of the occupants of the premises where the plaintiff lived. However, that use must be a purposeful one—the passage from one part of the land to the other part across the railroad. It did not contemplate the children playing upon the track, even at the crossing. It is hard to conceive a mindful purpose on the part of the plaintiff, a child less than 14 months old, when he crept out on the track. Under the circumstances it is difficult to see how he can be classi-

fied other than as a trespasser. Some Ohio cases so regard such a situation. *L. S. & M. S. Ry. Co.* v. *Lüdtke*, 69 Ohio St., 384, 69 N. E., 653; *Rd. Co.* v. *Harvey*, 77 Ohio St., 235, 83 N. E., 66, 122 Am. St. Rep., 503, 19 L. R. A. (N. S.), 1136; *Hannan, Admr.*, v. *Ehrlich*, 102 Ohio St., 176, 131 N. E., 504.

But assuming the plaintiff's status was in the exercise of his right, it was the duty of the company to exercise ordinary care for his safety. Did it do so?

The trial court charged the jury at some length regarding the duty imposed upon the railroad company to keep the weeds cut along its right of way, and quoted Section 7149, General Code. We think this law was not intended as a safety measure for the protection of persons upon the right of way, but rather for the protection of adjoining lands from noxious weeds growing on the right of way. The weeds are of moment here only as an obstruction to view, and the statute makes no difference in this respect. Had the weeds or grass been a foot high along that path that June afternoon, they would have fully obstructed the view of the trainmen of this child creeping down the slope, and that is the only way the presence of weeds could have affected the situation.

This was a private right of way in the open country, some miles from any town, and the track was straight and level. The company had the right to operate its trains at such speed as it wished, having regard for the safety of the persons and property in its charge. Could it be said that a speed of 20 to 30 miles per hour for that train was negligence?

It is urged that the company owed a duty to give warning signals by whistle and bell at this farm crossing, and that Section 8853, General Code, applies to a farm crossing. The signal provided by that section is the sounding of the whistle and ringing of the bell 80 to 100 rods from a crossing. As this farm crossing was but 14 feet more than 100 rods from the

whistling post for the highway crossing south of the farm crossing—and the mother and brother of the plaintiff, as well as the train crew, testified the whistle was blown—that contention seems to be out, regardless of whether the statute requires such warning at a farm crossing. It is also difficult to understand what such warning signals could have meant to this baby that day.

Recognizing as we must that the operation of a heavy train such as this was a practical matter, and that the men in charge of it have various duties to properly claim their attention, we do not think the mere fact that the trainmen did not see the small, creeping child on that track away from the highway, and probably even some distance from the farm crossing, was evidence of negligence on their part in respect to their lookout, or the control they maintained over their train.

To all of these considerations, that of proximate cause must be added. Having regard for all of these things, and testing them by the standard of ordinary care, we can but conclude that reasonable minds could arrive at but one conclusion under this evidence—that negligence was not proven.

This being true, it was the duty of the trial court to have granted defendant's motion for a verdict on the evidence, and on it to have entered final judgment. That not having been done, this court will reverse the case and enter such judgment.

*Judgment reversed.*

LLOYD and OVERMYER, JJ., concur.